UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| THERESA EATON, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:07-cv-0342-LJM-TAB |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| Defendant. | ) | |

**ENTRY ON JUDICIAL REVIEW**

Plaintiff, Theresa Eaton ("Eaton"), requests judicial review of the final decision of defendant, Michael J. Astrue, Commissioner of Social Security ("Commissioner"), denying Eaton's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act").  The Court rules as follows.

## I.  BACKGROUND

Eaton applied for DIB alleging that she became disabled on August 12, 2003, as a result of asthma, COPD, HBP, diabetes, sleep apnea, arthritis, acid reflux, GERD, depression and back problems.  R. at 84.  Eaton was fifty-five years of age on the onset date of her alleged disability.  R. at 18.  She had completed high school and had completed one year of college.  R. at 18.  Prior to her alleged disability onset date Eaton was employed as a sedentary, semi-skilled payroll clerk and as a sedentary, semi-skilled personnel clerk.  R. at 30.

## A.  TREATING PHYSICIAN RECORDS

According to Eaton's medical records, she received the majority of her healthcare from Debasish Dasgupta, M.D. ("Dr. Dasgupta"), during the relevant period.  *See, e.g.*, R. at 217-79.  On May 27, 2004, Eaton was seen by Dr. Dasgupta at which time the record indicates that her blood pressure was within the normal range and that her blood sugar ranged between 110 and 160 during the preceding two weeks.  R. at 188.  Dr. Dasgupta saw Eaton again on September 13, 2004, at which time Eaton reported her blood sugar levels in the range between 100 and 130.  R. at 273.  Dr. Dasgupta noted that Eaton's non-insulin dependent diabetes mellitus was well-controlled and Eaton was to continue her medication.  R. at 273.  Dr. Dasgupta also noted that Eaton was showing some signs of depression because she was not going out much.  R. at 273.

On September 21, 2004, X-rays of Eaton's lumbar spine demonstrated unremarkable vertebral height and alignment, but there was a loss of disc height with endplate sclerosis at the L4-L5 and L5-S1 levels.  R. at 220-22.  At the L5-S1 level there was calcification within the disc as well, consistent with early bony fusion.  R. at 220-22.  There was facet hypertrophy within the lumbar spine beginning at the L3-L4 level through the L5-S1 level.  The overlying soft tissues were grossly unremarkable. According to the treatment notes, the diagnosis was lumbar spondylosis most marked by facet hypertrophy.  R. at 220-22.

Also on September 21, 2004, X-rays of Eaton's knees indicated mild bilateral patellofemoral enthesopathy, mild bilateral medical compartment osteophytosis, with the left knee worse than the right, and no fractures.  R. at 220-22.  According to the treatment notes, the diagnosis was mild bilateral bi-compartmental osteoarthritis.  R. at 220-22.

2

On December 3, 2004, Dr. Dasgupta noted that Eaton's blood pressure was 173/76; her weight was 255.2 pounds; her mood and affect were normal; her neck supple with no lymphadenopathy and no thryomegaly; her chest was clear to ausculatation, with no wheezes and no crackles; her heart had normal S1 and S2, a regular rate and rhythm, no murmurs, gallops, or rubs; her abdomen was soft, non-tender; and regular bowel sounds were heard. R. at 268. Eaton's left knee was tender. R. at 268. But her neurologic exam was normal. R. at 268. An Accucheck result was listed as 175, forty-five minutes after Eaton ate lunch, and Hgb A1C was 6.3%, with a reference range of 4.6%-6.5%, indicating good control of Eaton's diabetes. R. at 269. Eaton was to continue her medications. R. at 269.

Dr. Dasgupta also examined Eaton on June 6, 2005. R. at 258-61. At that time, Eaton reported that she had run out of medications and needed refills. R. at 258-61. According to Dr. Dasgupta's notes, Eaton had not been taking her medications for financial reasons. R. at 258-61. Eaton did not have her blood sugar record and had gained thirteen pounds over the past six months. R. at 258-61. Her blood pressure was 145/67; she weighed 268 pounds; her mood and affect were normal; her neck was supple with no lymphadenopathy and no thyromegaly; her chest was clear to auscultation, she had no wheezes and no crackles; her heart demonstrated normal S1 and S2, had a regular rate and rhythm, and no murmurs, gallops or rubs; her extremities revealed no clubbing and no edema. R. at 258-61. An Accucheck performed on that date indicated a reading of 152 and an Hgb A1C at 9.6%, which was worse than at Eaton's last visit. R. at 258-61. Dr. Dasgupta reported that Eaton's hypertension was uncontrolled with her blood pressure reading of 145/67. R. at 258-61. Based on these findings, Dr. Dasgupta reported that he told Eaton to finish her supply of Glipizide

XL and then start Glucovance, and that he was going to treat her with Hyzaar instead of Lisinopril. R. at 258-61.

During a December 19, 2005, visit to Dr. Dasgupta, Eaton complained of pain in her left knee with locking and popping in the joint with increased pain at night. R. at 248-52. Upon examination, Eaton's left knee exhibited crepitus and tenderness. R. at 248-52. In addition, Eaton reported that her asthma was doing better since she had started taking Qvar that Dr. Erhardt has started her on; she reported using her inhaler less than three times per week. R. at 248-52. At this visit Eaton's blood pressure was 128/80; her weight was 276 pounds; her lungs were clear to auscultation; her heart sounds were normal and regular; her diabetes was well-controlled with her last Hemoglobin A1C reading at 7.5%, and an Accucheck reading of 177. R. at 248-52. Eaton's asthma was well controlled also. R. at 248-52. Eaton was asked to return with all of her pill bottles for a medication review. R. at 248-52.

Eaton returned to Dr. Dasgupta's office for a disability exam on April 17, 2005. R. at 244-47. At the time, Eaton reported that she was depressed at the thought of having to rely upon family for financial help, had considered suicide at one point in time, but decided against it, and reported that she was not suicidal at that time. R. at 244-47. Eaton also reported that she was smoking on pack of cigarettes per day. R. at 244-47. Dr. Dasgupta noted, however, that depression, low back pain and knee pain were all negative at that time. R. at 244-47. A physical exam revealed that Eaton's blood pressure was 160/102; she weighed 279 pounds; she was awake, alert, and oriented; her mood and affect were normal; her neck was supple, with no lymphadenopathy and no thyromegaly; her chest was clear to auscultation with no wheezes or crackles; she had a normal S1 and S2, a regular heart rate and rhythm with no murmurs, gallops or rubs; her extremities

4

demonstrated no clubbing and no edema; a neurologic exam was grossly normal.  R. at 244-47. However, Dr. Dasgupta diagnosed Eaton with acute sinusitis, which Dr. Dasgupta treated with Amoxicillin; uncontrolled hypertension, which Dr. Dasgupta noted was caused by Eaton not having any medication; and depression, which Dr. Dasgupta treated with a trial of Prozac.  R. at 244-47.

On May 24, 2006, a magnetic resonance imaging scan of Eaton's left knee indicated mild narrowing of the cartilage of the lateral compartment and mild subcutaneous edema.  R. at 234. Otherwise, the cartilage surfaces were intact, the posterior anterior cruciate ligament was unremarkable, the medial and laterial menisi were intact, there was no abnormal fluid signal, and the bone marrow signal was unremarkable.  R. at 234.  The diagnosis was mild degenerative changes of the lateral compartment and mild subcutaneous edema.  R. at 234.

## B.  STATE AGENCY EXAMINATIONS

On April 26, 2004, Nancy A.M. Ingwell, Ph.D. ("Dr. Ingwell"), a state agency physician, performed a psychological examination on Eaton.  R. at 155-59.  When Dr. Ingwell asked Eaton why she thought she was disabled, Eaton stated that she had asthma, lower back pain, high blood pressure, diabetes and bronchitis.  R. at 155.  Eaton also reported that she had a difficult time thinking and that she would go into a depression where she did not feel like doing anything, however when asked if she had thoughts of suicide or had attempted suicide Eaton responded in the negative. R. at 155 & 156.  Eaton claimed to have occasional anxiety attacks where she would experience trouble breathing and chest pains.  R. at 155.  Eaton reported that she sometimes felt discouraged. R. at 156.  She reported to Dr. Ingwell that her concentration was okay but she had a short memory. R. at 156.

Eaton was able to answer the majority of the mental status evaluation questions correctly. R. at 157-58.  Her mood was within normal limits, although her speech was very soft and slow at points during the interview.  R. at 158.  Eaton reported that she dresses daily, takes a bath or shower every day, cooks, cleans, does laundry, and shops.  R. at 159.  She watches television off and on during the day, usually the news and she goes to church.  R. at 159.  Eaton reported that she sees members of her family and friends, often at church, but does not visit with neighbors.  R. at 159.

Dr. Ingwell opined that Eaton expressed mild features of depression and anxiety and had a GAF[1] of 70.  R. at 159.  Dr. Ingwell stated that Eaton was capable of managing funds and taking care of herself.  R. at 159.

On April 27, 2004, Dr. Phillip S. Budzenski ("Dr. Budzenski"), a state agency physician, performed an internal medicine exam on Eaton.  R. at 160-69.  Eaton reported to Dr. Budzenski that she had been diagnosed with asthma in 2002 and used an Albuterol inhaler as needed; she had only been hospitalized for asthma once in 2003.  R. at 160.  Eaton also reported that she had been a one-pack-per-day smoker for twenty years but had quit just that month.  R. at 160.

Eaton told Dr. Budzenski that she had been diagnosed with type II diabetes mellitus in 2002 also.  R. at 160.  In addition, Eaton reported that

> she has been told to lose weight.  She is not following an ADA diet.  She is not limiting her calories sufficiently to lose weight.  She states that she checks her blood sugars twice a day and finds them to be between 110 and 160.  She has had an episode of cellulitis in her right lower extremity that may have been related to her diabetes.  She denies any diabetic foot ulcers, diabetic neuropathy and diabetic retinopathy.

---

[1] "GAF" stands for "Global Assessment of Functioning," which is a measurement of "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  American Psychiatric Ass'n, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. Rev. 2000) ("DSM-IV").

R. at 160.

Eaton reported to Dr. Budzenski that she had been diagnosed with hypertension in 2002. R. at 160. She followed a no-added salt diet and had little to no caffeine. R. at 160. Eaton reported that she used Atenolol and/or Lisinopril for her blood pressure and generic Lasix and Potassium. R. at 160.

Eaton did not volunteer any information to Dr. Budzenski about depression. R. at 161. Dr. Budzenski noted that she was not taking any medication at that time for depression and that her treating physician's office note dated December 16, 2003, did not have a diagnosis of depression. R. at 161.

Eaton reported being treated with CPAP for sleep apnea. R. at 161. Dr. Budzenski noted that her pulmonary function testing indicated restrictive lung disease without evidence of obstructive lung disease. R. at 161.

Dr. Budzenski noted that Eaton was a one-pack-per-day smoker for twenty years prior to April 2003. R. at 161. She claimed to have quit smoking completely four months prior to her examination by Dr. Budzenski. R. at 161.

Upon examination, Dr. Budzenski reported that Eaton's blood pressure was 160/100, her heart rate was 86 and her respiratory rate was 14. R. at 162. Eaton was appropriately dressed. R. at 162. Dr. Budzneski noted that Eaton was obese and ambulated with a slightly wide based gait that was otherwise normal. R. at 162. Eaton was able to get on and off the exam table "with some limited difficulty." R. at 162. Eaton's speech was fluent, she followed directions and commands without difficulty, and was able to hear and understand normal conversation tones. R. at 162.

Eaton's memory for recent and remote medical events was good and Dr. Budzenski found her intellectual function to be "grossly normal."  R. at 162.

Dr. Budzenski reported no issues with Eaton's head, neck or chest.  R. at 162.  His examination of Eaton's heart revealed a regular rate and rhythm with a normal S1 and S2.  R. at 162. There was no apparent murmur, rub or gallop.  R. at 162.  Eaton's abdominal exam was normal except to the extent it was limited by her obesity.  R. at 162.

With regard to peripheral vascular health, Dr. Budzenski reported that Eaton had evidence for venous stasis changes of mild severity and, on the right side, there was some early brawny edema. R. at 163.  "She otherwise [had] only 1+ edema bilaterally."  R. at 163.

After performing a thorough exam of Eaton's musculoskeletal functions, Dr. Budzneski reported that

> [Eaton] had fairly well preserved range of motion for her size.  Straight leg raising testing was negative in the seated position.  Straight leg raising testing was negative up to [seventy] degrees in the supine position.  Unable to lift her legs further than [seventy] degrees secondary to body habitus.  She had no sensory loss or reflex abnormalities.  She has [five] out of [five] motor throughout.

R. at 165.

Dr. Budzenski reported the following other findings:

> IMPRESSION:
> 1.    Malignant hypertension.
> 2.    History of asthma well controlled.
> 3.    Morbid obesity by body mass criteria.
> 4.    Type II diabetes mellitus poor control non-compliant.
> 5.    Lower extremity swelling.
> 6.    History of tobacco abuse current cessation.
> 7.    History of sleep apnea controlled with CPAP mask.

With regards to the breathing, . . . [o]n examination of the lungs, the pulmonary examination is normal.  [Eaton] was not dyspneic on examination at rest, lying down,

> or with mild exertion.  There is no clubbing or cyanosis of the extremities.  There are
> no wheezes, rhonchi, or rales.  Pulmonary test was performed a[t] today's
> examination. . . .  Pulmonary function testing shows normal spirometry.
>
> With regards to the diabetes, [Eaton] has not been limiting calories or carbohydrates
> sufficiently to lose weight.  She has not been following an ADA diet.  She has not
> had any diabetic neuropathy or retinopathy up to this point.
>
> With regards to her allegation of depression, there were no listings in her MER
> suggesting she had ever been diagnosed with depression.

R. at 165.  In summary, Dr. Budzenski opined that Eaton "should be able to perform light work

continuously."  R. at 165.

On June 2, 2004, D. Unversaw, Ph.D. ("Dr. Unversaw"), reviewed Eaton's medical record

from a psychiatric standpoint.  R. at 170-83.  This report was also reviewed and affirmed by W.

Shipley, Ph.D. ("Dr. Shipley").  R. at 170.  Dr. Unversaw concluded that Eaton had no severe mental

impairments, but had mild depression and anxiety.  R. at 170, 173, 175.  Dr. Unversaw opined that

Eaton only had mild functional limitations in the areas of activities of daily living, maintaining social

functioning, and maintaining concentration, persistence and pace.  R. at 180.  She had no episodes

of decomposition for an extended duration.  R. at 180.  Dr. Unversaw concluded that Eaton's

"condition does not meet listing and is non-severe."  R. at 182.  In support of his conclusion, Dr.

Unversaw noted that:

> Current function is unremarkable.  [Eaton] dresses daily, take[s] a bath or shower
> everyday, cooks, cleans, does laundry, and shops.  Although she does not read, she
> watches TV on and off throughout the day.  She attends church with the public
> church members.  She loves working on puzzles and does so everyday.  She prepares
> meals an[d] raises one son living in the household.  [Eaton's] mood and affect was
> within normal limits and her mental trend was ok.

R. at 182.

Sometime in October 2004, Joseph N. Gaddy, M.D. ("Dr. Gaddy"), evaluated Eaton's file. R. at 199-208.  After reviewing the record Dr. Gaddy concluded that Eaton could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and her ability to push and/or pull is limited to the same extent as her ability to lift and/or carry.  R. at 200.  He also opined that Eaton can occasionally climb ramps and stairs, and can occasionally balance, stoop, kneel, crouch, and crawl.  R. at 201-2.  Dr. Gaddy recommended that Eaton avoid environmental temperature extremes and exposures that would exacerbate her asthmatic symptoms. R. at 204.  In addition, Dr. Gaddy noted that Eaton had not manipulative, visual or communication limitations.  R. at 203.  Dr. Gaddy concluded that Eaton could perform light exertional work activity. R. at 199-207.

## C.  PROCEDURAL HISTORY

Eaton's application was denied initially and on reconsideration.  R. at 44-45.  Eaton requested a hearing before an administrative law judge ("ALJ"), which took place on July 28, 2006.  R. at 280-308.  Eaton, who was represented by counsel at the hearing, Donald Charous, M.D., a medical expert ("ME"), and Michael Blakenship, a vocational expert ("VE"), testified at the hearing.  R. at 280-308.

At the hearing the ME testified that she had several documented physical impairments, which included:  type II diabetes, morbid obesity, hypertension, asthma, chronic low back pain, mild osteoarthritis in her knee, and sleep apnea.  R. at 296.  The ME noted that several examining physicians had claimed that Eaton's subjective symptoms did not correlate with the physical exam. R. at 296-98.  The ME opined that her physical impairments, alone or in combination, did not meet

or equal in severity any listing.  R. at 298.  The ME stated that he would agree with Dr. Budzenski's opinion that Eaton could perform the full range of light work continuously.  R. at 298-99. Specifically, the ME opined that Eaton could lift and/or carry twenty pounds occasionally and ten pounds frequently.  R. at 299.  She could stand and/or walk six out of an eight-hour day.  R. at 299. The ME did not think Eaton needed assistance to ambulate.  R. at 299-300.  With normal breaks, the ME stated that Eaton could sit a total of six hours out of an eight-hour day.  R. at 300.  The ME opined that Eaton "probably could sit continuously for about [forty-five] minutes to an hour then maybe she might have to stand up or walk around for [five or ten] minutes."  R. at 300.  The ME stated that he did not think her limitation on pushing, or pulling from either her upper or lower extremities would be the same as that for carrying.  R. at 301.  The ME would not recommend that Eaton climb ladders, ropes or scaffolds, however, she could do some stairs and a ramp occasionally, as well as balance, stoop or bend, kneel, crawl or crouch occasionally.  R. at 301.  Because of Eaton's asthma, the ME suggested that Eaton should avoid environments that had gases, fumes, odors, dust etc., or concentrated humidity, as well as environments that had exposure to extreme heat or cold  R. at 302.  The ME also opined that Eaton should avoid hazards such as machinery and heights.  R. at 302.

The VE testified at the hearing that Eaton's former employment as a payroll clerk was a sedentary job and semi-skilled.  R. at 304.  Eaton's former employment as a personnel clerk would also be classified as a sedentary job and semi-skilled.  R. at 305.  The ALJ proposed the following hypothetical to the VE:

> We have a . . . woman who is currently age [fifty-eight], had completed one year of college.  Past relevant work experience is as a payroll clerk and a personnel clerk. She has the following impairments as documented by the record, [the ME]

summarized the medical evidence of record.  It is reasonably consistent with the evidence of record documenting the presence of type II diabetes.  She has morbid obesity, high blood pressure, asthma which is controlled.  We do have some degenerative changes of the back or as [the ME] put it lumbar spondylosis, mild osteoarthritis of the knees, left is worse, obstructive sleep apnea treated with CPAP and a question of fibromyalgia. From a mental standpoint we have 4F-5, the opinion of Dr. Ingwell who performed an examination clinically of [Eaton] and the result was no diagnosis of mental impairment.  The state agency said any mental impairment would be nonsevere and I have no reason to disagree with that assessment on this record evidence.  She would have the ability to perform work activities consistent with the opinion of [the ME].

* * *

Could that hypothetical individual perform [Eaton's] past work as she actually performed it . . . .

R. at 305-06.  The VE responded that Eaton could perform both her past jobs, payroll clerk and personnel clerk, as they are ordinarily and customarily performed in the national economy.  R. at 306.

Eaton's counsel proposed to the VE a different hypothetical that included additional limitations on Eaton's ability to lift or carry weights of only ten pounds and additional limitations on Eaton's ability to consistently work an eight-hour day because of back pain.  R. at 307.  The VE clarified that if Eaton was unable to work an eight-hour day three or four times per month then it would "preclude all work."  R. at 307.  With just the lifting restriction, however, Eaton would still qualify under the guidelines for sedentary work.  R. at 307.

12

## D.  ADDITIONAL EVIDENCE IN THE RECORD

According to Eaton, she takes care of her granddaughter three days a week for six hours.  R. at 106.  Dr. Budzenski had reported that she cared for a four-year-old daughter, but all of Eaton's children are adults.  R. at 161 & 157.

## II.  <u>DISABILITY & THE STANDARD OF REVIEW</u>

### A.  DISABILITY

To be eligible for disability insurance benefits, a person must be both disabled and insured.  42 U.S.C. § 423(a)(1).  Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which has lasted or can be expected to last for a continuous period of not less than twelve months.  *See* 42 U.S.C. § 423(d)(1)(A).  Eaton was disabled if her impairments were of such severity that she was unable to perform work that she had previously done, and if, based on her age, education, and work experience, she could not engage in any other kind of substantial work existing in the national economy.  *See* 42 U.S.C. § 423(d)(2)(A).

This standard is stringent.  The Act does not contemplate degrees of disability or allow for an award based on partial disability.  *See Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985).  It must be clear that the claimant has an impairment severe enough to prevent her from performing virtually any kind of work.  Under the statutory standard, these benefits are available only as a matter of nearly last resort.

The ALJ's decision followed the familiar five-step sequential analysis set forth in the regulations to determine whether Eaton was disabled under the Act.  These steps are:

(1) Is the claimant engaging in substantial gainful activity?  If so, he or she is not disabled.

(2) If not, does the claimant have an impairment or combination of impairments that are severe?  If not, he or she is not disabled.

(3) If so, does the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If so, the claimant is disabled.

(4) If not, can the claimant do his or her past relevant work?  If so, he or she is not disabled.

(5) If not, can the claimant perform other work given his or her residual functional capacity ("RFC"), age, education, and experience?  If so, then he or she is not disabled.  If not, he or she is disabled.

*See* 20 C.F.R. § 404.1520.  When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step.  *See Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

## B.  STANDARD OF REVIEW

The Act provides for judicial review of the Commissioner's denial of benefits.  *See* 42 U.S.C. § 405(g).  Because the Appeals Council denied review of the ALJ's findings in this case, the ALJ's findings are treated as the findings of the Commissioner.  *See, e.g.*, *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).  In making his determination, the ALJ must clearly articulate his analysis of the evidence, building an accurate and logical bridge from the evidence to his conclusion.  *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002); *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).  The ALJ does not need to address every separate document in the record, but he must not select only those documents for review that support his analysis.  "His written decision should

14

contain, and his ultimate determination must be based upon, all of the relevant evidence in the record." *Garfield v. Schweiker*, 732 F.2d 605, 609 (7th Cir. 1984).

The Court must accept the ALJ's findings of fact as conclusive if they are supported by substantial evidence and there has been no error of law. *See Dixon v. Massanari*, 270 F.3d 1171,1176 (7th Cir. 2001). Substantial evidence means such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *See Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the Court must defer to the Commissioner's resolution of that conflict. *See Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). A reviewing court may not decide the facts anew, re-weigh evidence, or substitute its judgment for that of the ALJ. *See Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001). The reviewing court will also confine its review to the reasons supplied by the ALJ. *See Steele*, 290 F.3d at 941. A reversal and remand may be required if the ALJ committed an error of law, *see Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997), or if the ALJ based the decision on serious factual mistakes or omissions. *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).

## III. <u>DISCUSSION</u>

In a twenty-one page opinion, at Step 1, the ALJ found that Eaton had not performed any substantial gainful activity since August 12, 2003. R. at 18. At Step 2, the ALJ carefully recited all the medical evidence in the record and concluded that Eaton did not have a severe emotional, mental, psychological, or psychiatric impairment under the Act, and that Eaton's physical impairment did not meet or equal any impairment or combination of impairments enumerated in Appendix 1,

Subpart P, Regulations No. 4.  R. at 18-30.  At Step 3, the ALJ adopted the residual functional capacity ("RFC") analysis provided by the ME at the hearing.  R. at 30.  Considering her vocational profile and her RFC, the ALJ concluded that Eaton could perform her past relevant work.  R. at 30-36.  At Step 4, because Eaton was capable of performing her past relevant work, the ALJ concluded that Eaton was not disabled under the Act.  R. at 36.

Eaton asserts that the ALJ erred in four ways:  (1) the ALJ mischaracterized the evidence or adopted incorrect factual assertions; (2) the ALJ improperly rejected Dr. Dasgupta's medical opinion and adopted that of the non-treating ME; (3) the ALJ failed to articulate a function-by-function assessment of Eaton's RFC and logically bridge the evidence to the denial's conclusion; and (4) the ALJ failed to discern the specific functions of Eaton's past relevant work before concluding that she could return to that work.

## A.  ALLEGED EVIDENTIARY ERRORS

Eaton claims that the ALJ erred when he states throughout the opinion that there is no evidence that Eaton was diagnosed with depression.  Eaton relies upon Dr. Dasgupta's diagnosis of depression and the reference to trying Prozac to refute the ALJ's statements.  R. at 244.  In addition, Eaton claims that the ALJ relied upon the ME's assertion that Eaton cared for a four-year-old daughter; the ALJ ignored the record evidence that all of Eaton's children are adults.

The Court cannot agree with Eaton's characterization of the ALJ's decision.  Despite Eaton's claim to the contrary, the ALJ cited numerous places in the record that contradicted Eaton's claim that she had active depression.  This contrary evidence included Dr. Ignwell's report, and the reviewing physicians' report dated June 2, 2004  R. at 158-59; 170-82.  The ALJ also noted that the

16

only place in which there is clinical evidence of Eaton's depression is in Dr. Dasgupta's clinical notes from April 17, 2006, in which he agrees to prescribe Prozac on a trial basis, but also noted that she had a normal mood and affect, with "negative" signs of depression. R. at 243-44. In addition, the ALJ considered Eaton's own testimony regarding her mild restrictions on daily living, social functioning, concentration, persistence, pace, and upon the fact that Eaton had not reported any extended periods of decompensation due to any emotional, mental, psychiatric or psychological impairment. R. at 26. The Court concludes that the ALJ did not misstate the evidence in the record with respect to Eaton's alleged mental impairment.

With respect to the ALJ's mis-statement that Eaton cares for a four-year-old daughter, it is reasonable to conclude from the evidence in the record that this misstatement is only one of the relationship of Eaton to the four-year-old who is in her care three days a week for six hours. Eaton reported herself that she cares for her granddaughter three days a week for six hours. R. at 106. However, Dr. Budzenski's report indicated that she has a four-year-old daughter who is in her care. R. at 161. What is important for the purposes of evaluating the outcome in this case, however, is the fact that Eaton is capable of caring for a granddaughter, presumably one who was four-years-old in 2004 when Eaton was examined by Dr. Budzenski. It is this aspect of the information that formed a small part of the ALJ's consideration of Eaton's ability to perform activities of daily life. R. at 26. There was certainly enough other evidence of the normality in Eaton's daily activities to support the ALJ's conclusion that she could perform sedentary work. R. at 26.

The ALJ did not err in his assessment of the record evidence on these points.

17

## B. DR. DASGUPTA'S OPINION

Eaton claims that the ALJ never recognized Dr. Dasgupta as Eaton's treating physician and never explained why the ALJ did not give Dr. Dasgupta's opinion controlling weight as required by 20 C.R.R. § 404.1527.  .  "A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (citing 20 C.F.R. § 404.1527(d)(2)).  Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ. *See Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); *Dixon v. Massanari*. 270 F.3d 1171, 1177 (7th Cir. 2001) ("[A] claimant is not entitled to disability benefits simply because [his] physician states that [he] is 'disabled' or unable to work.").

Here, it is clear that the ALJ considered all the record evidence regarding Eaton's alleged disabilities, including Dr. Dasgupta's opinions.  R. at 20-22, 23-25, 26-30, 31-34.  Moreover, it is clear from the medical evidence and the ALJ's statement at the hearing that Dr. Dasgupta was Eaton's treating physician.  R. at 298.  Moreover, the ALJ specifically stated in his opinion that Dr. Dasgupta's opinion that Eaton is was unable to do sedentary work or any work activity at all "is not consistent with his own treatment notes and records, nor with the other medical evidence of record, nor with the objective medical evidence of record, nor with the clincial and laboratory findings of record."  R. at 34.  The ALJ then gives a lengthy recitation of specific examples of places in the record that contradict Dr. Dasgupta's conclusions.  R. at 34.  Only after that lengthy recitation does the ALJ accept Dr. Charous' opinion over that of Dr. Dasgupta.  R. at 34.  Clearly, the ALJ

18

reasonably evaluated the medical source opinions and properly resolved the evidentiary conflicts. *See Stephens v. Heckler*, 766 F.3d 284, 287 (7th Cir. 1985).

## C.  RFC DETERMINATION

Eaton also asserts that the ALJ failed to articulate a function-by-function assessment of her RFC and that he failed to logically bridge the evidence to his conclusion that Eaton could perform the full range of sedentary work.  However, at the hearing, the ALJ clearly went through each of the functions listed at 20 C.F.R. § 404.1545, paragraphs (b), (c), and (d), with the ME.  R. at 298-302. In his opinion, the ALJ specifically adopted the ME's recommended RFC and carefully reviewed the record evidence that supported his and the ME's conclusion.  R. at 30-35.  The ALJ clearly articulated his findings in regard to all of the relevant requirements.

## D.  THE ALJ'S INVESTIGATION OF EATON'S PAST RELEVANT WORK & ANALYSIS OF EATON'S ABILITY TO PERFORM HER PAST RELEVANT WORK GIVEN HER RFC

Eaton also contends that the ALJ erred by not investigating the specific functions of Eaton's past relevant work before he concluded that she had the RFC to perform this work.  But Eaton ignores the ALJ's discussion of her past relevant work at the hearing with the VE.  R. at 304-07.  The VE testified that, after his review of the vocational evidence in the record, the Dictionary of Occupational Titles ("DOT"), provided that a person who performed the work that Eaton claimed she did would be classified as a sedentary, semi-skilled worker.  R. at 304-05.  The DOT guidelines are an acceptable means for determining the requirements of a claimant's past relevant work.  *See Anderson v. Bowen*, 868 f.2d 921, 925 n.11 (7th Cir. 1989) (citing 20 C.F.R. § 404.1566(d)(1)).

19

Moreover, the ALJ carefully questioned the VE about Eaton's ability to perform her past work as it was characterized in the evidence and in the DOT given her current exertional, postural, and other limitations as set forth by the ME at the hearing.  R. at 305-06.  The VE testified that Eaton could perform her past relevant work given those limitations.  R. at 305-06.  Sequentially, then, the ALJ was entitled to adopt the VE's opinion that, given Eaton's RFC, she could perform her past relevant work as the VE understood it from the record and the DOT.  *See Jens v. Barnhart*, 347 f.3d 209, 213 (7th Cir. 2003).

At the hearing, Eaton's counsel did elicit a different response from the VE based on an alternative hypothetical, however, the ALJ's hypothetical already accounted for all of Eaton's limitations that had substantial support in the record.  Eaton points to no evidence, other than her own testimony, that she was unable to perform the RFC adopted by the ALJ.  The ALJ's analysis of Eaton's past relevant work and her ability to perform said work give her RFC is substantially supported by the record evidence.  R. at 30-36.

## IV.  CONCLUSION

For the reasons stated herein, the Court **AFFIRMS** the decision of defendant, Michael J.

Astrue, Commissioner of Social Security, to deny plaintiff, Theresa Eaton, Disability Income

Benefits under the Social Security Act.

IT IS SO ORDERED this 11th day of March, 2008.


_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana


Electronically distributed to:

Charles D. Hankey
charleshankey@hankeylawoffice.com

Thomas E. Kieper
United States Attorney's Office
tom.kieper@usdoj.gov